(C. D. 415)

David L. Moss & Co., Inc. *v.* United States

United States Customs Court, Third Division

(Decided January 6, 1941)

*Daniel P. McDonald* for the plaintiff.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

*Arthur L. Israel* filed a brief as *amicus curiae.*

Before Cline, Evans, and Keefe, Judges; Keefe, J., not participating

Evans, Judge: This is an action against the United States in which the plaintiff seeks to recover money claimed to have been illegally collected as customs duties upon an importation of merchandise from China described on the invoice and entry as dried hen egg albumen. Duty was assessed upon the commodity by the collector of customs at the port of New York at the rate of 27 cents per pound under paragraph 713 of the Tariff Act of 1930 as amended by the Presidential Proclamation published in T. D. 44997. Plaintiff's claim is based upon the theory that the commodity is not dried egg albumen but is a manufacture of fresh egg albumen produced by a fermentation process by means of which radical physical and chemical changes in the albumen took place, which resulted in removing the commodity from the designation of dried egg albumen within the meaning of that term in said paragraph 713. Plaintiff therefore alleges that not being provided for in paragraph 713, *supra,* and not being enumerated elsewhere in the act, it is relegated to the provision in paragraph 1558 of the same law as an unenumerated article manufactured in whole or in part and dutiable at 20 per centum ad valorem.

The competing paragraphs as amended, are in the following language:

Par. 713.   Eggs of poultry, in the shell, 10 cents per dozen; whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved, and not specially provided. for, whether or not sugar or other material is added, 11 cents per pound; dried whole eggs  dried egg yolk, and dried egg albumen, whether or not sugar or other material is added, 27 cents per pound.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The question before this court for determination is whether this commodity is within the provision of paragraph 713, *supra*, for dried egg albumen, or whether the method of preparation takes it out of that descriptive term. It is the contention of the plaintiff that the term "dried egg albumen" is limited to liquid whites of egg from which the moisture has been removed; that the instant commodity consists of fermented egg whites which have undergone chemical and physical changes, and can no longer be considered egg albumen and therefore, when dried, are not within the meaning of the term "dried egg albumen." The Government in its brief contends that the merchandise is dried egg albumen both within the common meaning of that term and also within the meaning as judicially construed; that it is similar in properties, characteristics, and uses to commercially recognized dried egg albumen; and, further, that the provision in said paragraph 713 for dried egg albumen is not limited to unfermented albumen, and does not exclude fermented albumen.

The process of manufacture of the commodity is described in the testimony as follows:

The egg whites are separated from the yolk after being broken out from the shells, and the egg whites are then placed in vats or casks for a period of from 3 to 5 days in order that they ferment. At this time—3 to 5 days depends upon the temperature; the cooler the temperature the longer the time necessary to complete the fermentation process.

During the fermentation period a scum forms on the top of the liquid egg whites and brings to the top chalaza and strings and bits of insoluble matter, and there is also a sediment of pieces of eggshell dropped to the bottom.

When the fermentation is completed there remains a clear, thin liquid, which is drawn off, neutralized by the addition of ammonia, placed in shallow pans or trays in heated chambers until they are dried into crystalline form, that is, the moisture is substantially removed, leaving a moisture content of about 12 to 14 per cent.

When that is done the crystals or flakes are broken up into more or less uniform size, packed in 200-pound tin-lined wooden cases, and are ready for shipment abroad.

The testimony discloses that in other processes which are in use in China, the egg whites when taken from the shells are churned up and then placed in trays to dry until the moisture content has been reduced to about 12 or 14 per centum.

Each side produced the testimony of five witnesses. Most of these witnesses were men of long practical experience in the production of egg products, both the fermented dried egg albumen and the unfermented, in this country and in China. Some of them were chemists engaged both in producing dried egg products, including dried egg albumen, for large manufacturers, and in selling such products.

The use to which dried egg albumen is put is shown to be by bakers for cake icings, meringue toppings for pies, and by candy makers in certain types of candy.

On the issue as presented we must determine whether the method of preparation of the imported commodity results in dried egg albumen or something other than dried egg albumen. The difference in the process of manufacture between the product now before us and the so-called Chinese unfermented egg albumen lies in the fact that the instant commodity after the separation of the yolks from the egg whites is allowed to stand from 3 to 5 days to permit fermentation. When fermentation has progressed to a certain degree, the impurities and scum are removed from the mass and a small amount of ammonia is added, after which the commodity is placed in shallow trays or pans and permitted to dry. When dried it is scraped from the tins and the process is complete. In the case of the so-called unfermented egg albumen made in China the whites after separation from the yolks are immediately placed in shallow pans and dried by heated forced air drafts until substantially all moisture is removed.

The witnesses described certain domestic products which they stated were known as dried egg albumen. Among these were the Emulsol product, and the Armour dried egg albumen known by the trade name of Cloverbloom. The Emulsol product is made from liquid or frozen egg whites which are allowed to stand at room temperature for several days. They are then combined with a larger batch in the ratio of 10 to 1, and the whole held at 70° F. for approximately 18 hours, after which a small portion of ammonia is added and the product placed in shallow pans, dried by the circulation of warm air and then scraped from the pans. Cloverbloom is produced by the following process. The fresh whites of the eggs are collected in buckets and placed in vats of approximately 15,000 pounds capacity. The entire mass is kept in the containers for 3 to 3½ days during which time it is stirred continuously. Then, by means of high pressure, it is pumped through a spray drying machine into a heated chamber where it immediately forms into a white powder. It is then collected and is ready for use.

There was also testimony to the effect that the same corporation which makes the Cloverbloom product at one time attempted to produce an egg albumen by spray drying liquid egg whites without any previous treatment. However, this product was not successful in the trade.

Other samples were introduced in evidence, viz, the so-called Duche product and a domestic unfermented dried egg albumen made in Texas. The process of manufacture of the last two named, however, was not disclosed but they were marked for identification for

the purpose of comparison with the imported product, inasmuch as they were known as dried egg albumen.

One of the defendant's witnesses also produced a sample of a laboratory dried egg albumen which he testified was made by placing fresh liquid egg whites in an enameled pan and blowing air at room temperature over the contents of the pan until they were substantially dried.

From this testimony it is apparent that there are various methods of preparation of what are described as dried egg albumens. It further appears that one large corporation with plants both in the United States and in China has experimented with the drying and preparation of egg albumen for a number of years in order to obtain a product which will be satisfactory to the trade.

From all of this testimony it is plain that there are a number of commodities on the market which are known as dried egg albumen, in which the process of manufacture differs materially.

It is interesting to note that the witnesses described all of these products as dried egg albumen, the only distinction being that some was designated as fermented (the commodity now before us) and others unfermented. The witnesses on behalf of the plaintiff testified that the instant commodity is not dried egg albumen, but a modified egg albumen with certain essential factors removed and others broken down, at least partially. This testimony was based upon the definition of dried egg albumen as given by plaintiff's witnesses, to wit, that it is the whites of eggs without any substantial change except for evaporation of water and that it contains sugar. However, the plaintiff's witness Schrag admitted on cross-examination that the fermented was sometimes known as dried egg albumen.

The testimony of both the plaintiff's witnesses and those of the Government was based on tests and analyses of samples of the instant merchandise as compared with similar tests and analyses of commodities known as dried egg albumen. Plaintiff in its brief objects to the conclusions drawn by the Government witnesses as the result of comparison of the instant commodity with the Armour and Emulsol products because it alleges that the Armour and Emulsol products are highly fermented and were to all intents and purposes almost identical in properties and uses to the instant commodity, except as to odor. However, we observe that Mr. Harris, a chemist, vice president in charge of production and research of the Emulsol Corporation, testified that said corporation is engaged principally in freezing and drying of eggs and egg products and that one of the important items of manufacture is dried egg albumen, and that a great deal of the research and development work which has resulted in the issuance of 40 patents in dried egg albumen, has been done by that corporation and he himself has made many thousands of tests of egg albumens. The witness Conquest, a research director for Armour & Co., has also

had long experience in research work in connection with the production of dried egg albumen as a commercial proposition both prior to 1930 and subsequent to that year. These witnesses used the term dried egg albumen in describing both their products and the instant commodity and we are unable to agree with plaintiff's contention that the Emulsol and Armour products are not dried egg albumen, and that, therefore, the comparison of those products with the merchandise before us is of little or no value.

The effort on the part of the witnesses for the plaintiff to show chemical distinctions between the product here imported and other dried egg albumen would seem to be nullified by the fact that they refer to the instant commodity as dried egg albumen and admit that it is bought and sold as such. It would seem that if their theory is correct there would be some term by which the instant commodity would be described by persons dealing in such merchandise, and the absence of such term in the trade indicates that the trade makes no distinction in nomenclature between fermented and other types of egg albumen.

From the various tests to which the instant commodity has been submitted, which are the usual tests for examining egg albumen, it is apparent that it is comparable with other dried egg albumens both in chemical and physical characteristics. As stated above, there are numerous processes of preparing dried egg albumen and we find that the process used in preparing the commodity now before us produces a resulting product which is used in the same way as other commercially recognized dried egg albumens and is similar in both physical and chemical characteristics to such dried egg albumens and has no new name, character, or use from such well-known products.

We think it unnecessary to review the decisions of this court and the Court of Customs and Patent Appeals involving dried egg albumen because, as stated above, the exact question presented here was not passed upon in any of those cases, although in the case of *F. H. Shallus & Co., et al.* v. *United States*, 18 C. C. P. A. 332, T. D. 44585, the question was raised. However, in that case, the court held that as the importer placed no reliance on that claim they would not consider it. The article there involved was produced in a manner practically identical with the process described by the witnesses herein.

Even if the merchandise before us were held not dutiable directly under paragraph 713, *supra*, we think it would fall within the terms of that paragraph by virtue of the similitude clause in paragraph 1559 of the same act. It has been often held that the provisions of the latter paragraph must be resorted to before recourse can be had to the nonenumerated provisions of paragraph 1558. *Bartley Bros. & Hall et al.* v. *United States*, 3 Ct. Cust. Appls. 363, T. D. 32961. Said paragraph 1559, insofar as pertinent, provides as follows:

28

Par. 1559. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *

Therefore, even if we were persuaded that this commodity was something other than egg albumen, as contended by the plaintiff herein, the evidence shows conclusively that it is substantially similar in at least the use to which it is applied to dried egg albumen. The statute does not require that the similitude shall exist in all four of the particulars mentioned. The rule was early laid down that it is enough if there exists a substantial similitude in any one of the particulars mentioned. *United States* v. *Roesseler*, 137 Fed. 770; *Hahn* v. *United States*, 121 Fed. 152; *Arthur* v. *Fox*, 108 U. S. 125; *Weilbacher* v. *Merritt*, 37 Fed. 85; *Sykes* v. *Magone*, 38 Fed. 494.

To summarize, we find that the instant commodity is dried; that it is comparable both in physical and chemical characteristics and in the use to which it is put to other commodities which are recognized as dried egg albumens. We further find that the process of manufacture does not remove the commodity from the term "egg albumen" as claimed by the plaintiff. The testimony preponderates to the effect that it is one grade of dried egg albumen, of which there are several grades, and that its use corresponds to the use of dried egg albumen. We therefore find that it is properly dutiable as assessed at 27 cents a pound under paragraph 713 of the Tariff Act of 1930 as amended by the Presidential proclamation published in T. D. 44997.

Judgment for defendant. It is so ordered.